UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ROY D. WILLIAMS, § | |
| § | |
| Plaintiff, § | |
| VS. § | |
| § | CIVIL ACTION NO. H-05-0090 |
| CURRAN COMPOSITES, INC., d/b/a § | |
| COOK COMPOSITES & POLYMERS § | |
| COMPANY, § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND ORDER

In this case, Plaintiff seeks redress, under 42 U.S.C. § 1981, for Defendant's termination of Plaintiff's employment of more than two decades. Defendant now seeks summary judgment. After considering the parties' filings, oral arguments, and the applicable law, the Court finds that the motion, Docket No. 17, should be and hereby is **GRANTED** and that Plaintiff's claims should be and hereby are **DISMISSED WITH PREJUDICE**.

### I.   BACKGROUND

Defendant Curran Composites, Inc., d/b/a Cook Composites & Polymers Company ("CCP") is a manufacturer of gel coat, resins, and coatings used in paint and related products. CCP hired Plaintiff Roy Williams in 1980 to work in its Houston plant. Williams was promoted to Operations Manager in 1983, demoted to Foreman in 1991, promoted to Inventory Control Manager in 1995, and again promoted to Production/Operations Manager in late 1997 or early 1998.

As Operations Manager, Williams reported directly to the Plant Manager, Paul Carpenter, who reported directly to Michael Lotman, the Director of Manufacturing, and

1

indirectly to Jean Roussenac, the Vice President of Manufacturing. Carpenter has testified that, during Carpenter's 2002 interview for the Plant Manager position, Roussenac stated that Williams was the only Black production manager at CCP and that Roussenac did not believe that Williams was competent to perform that job.

In December 2002, Carpenter performed an annual review and identified several areas in which Williams's performance needed improvement. In the space on the review form reserved for employee comments, Williams wrote that he intended to work on those problem areas and expressed respect and admiration for both Carpenter and Lotman. Carpenter reported to Roussenac that Williams was a good employee who was capable of effective performance if provided adequate support and guidance from his superiors. According to Carpenter, Roussenac expressed surprise at this assessment but appeared willing to accept it.

At the time of the review, Williams received a merit-based pay increase of 3.5%. Although he expressed the opinion that the increase should have been greater, there is no evidence to indicate that any other employee received a larger increase in pay in December 2002 or that the size of Williams's pay increase was influenced by racial discrimination.

In late 2002, CCP contracted with an outside company to perform a Modern Safety Management ("MSM") audit of the Houston plant in February 2003, identifying health and safety concerns and making recommendations for addressing those issues. In preparation for the MSM audit, CCP conducted its own internal audit of the Houston plant in November 2002. That internal audit identified several concerns that required immediate attention. CCP appointed Williams to lead Elements 3 and 4 of the correction

2

plan, which required Williams, *inter alia*, to devise and conduct planned inspections of all risk areas in the plant and to conduct an ongoing review of standard operating procedures to determine their adequacy and compliance with health and safety policies. Elements 3 and 4 received poor ratings in the February 2003 external audit, garnering 22.4% and 11.5%, respectively, of the available scoring points. All of the other elements at the plant received satisfactory scores.

On March 4, 2003, Carpenter issued a written memorandum detailing various aspects of Williams's job performance that required improvement: namely, his lack of visibility in the plant and his failure to prepare adequately for the February 2003 audit, conduct loss prevention tours, correct unsafe conditions, or conduct an ongoing review of standard operating procedures. Williams responded with a memorandum of his own, addressing each problem and expressing his intent to comply with the job requirements noted by Carpenter. Williams's memorandum again indicated that Williams admired Carpenter. Carpenter has testified that, at the time of the December 2002 performance review, he communicated to Williams his concern over Williams's implementation of a required cross-training program, and he felt that Williams was, overall, struggling in his efforts to meet Carpenter's high expectations. (*See* Def.'s Mot. for Summ. J., Ex. 4 (Carpenter Dep.), at 72.)

On May 28, 2003, Mary Bain, a chemist from CCP's corporate office and a Caucasian, visited the Houston plant to develop a new product, the manufacture of which required the use of a reactor. Before initiating the manufacturing process, Bain noticed that a residue had built up inside the kettle portion of the reactor, which needed to be cleaned before the reactor could be used. Bain asked Williams what type of solvent she

should use to clean the kettle, and Williams advised her to use methyl ethyl ketone ("MEK"), a highly flammable chemical. CCP policy requires that, in order to prevent an explosion, a kettle be "grounded" (*i.e.*, a hose be attached to the bottom) and "inerted" (*i.e.*, nitrogen be introduced through the bottom) before MEK is used to clean it.

Williams was not present the first time that Bain introduced MEK into the kettle. The parties disagree as to whether he was present when she added a second "hit" of MEK. It is undisputed, however, that the kettle was never grounded or inerted and that, prior to adding MEK to the kettle for the second time, Bain informed Williams that she intended to "hit" the kettle again, and he assented. CCP plant chemist Dele Ajumobi, a native of Nigeria, was present for both "hits." At Williams's request, Production Supervisor Mark McIntyre, a Caucasian, was present for the second "hit."

Bain later reported the MEK incident to Mark Auten, CCP's Safety Coordinator. Carpenter then undertook to investigate the incident. During the course of that investigation, Williams admitted that the responsibility for Bain's unsafe use of MEK lay with him. Williams has conceded that he should not have permitted Bain to proceed after she told him that she intended to "hit" the kettle again. (*See id.*, Ex. 15, at 1 ("I could and should have rejected this suggestion and sought other means."); *id.*, Ex. 1 (Williams Dep.), at 183 ("I knew what hit meant. . . . That would be unsafe.").)

On June 9, 2003, Carpenter and Lotman, along with Human Resources Vice President Jennie Newman, informed Williams that his employment was being terminated because of his poor performance in connection with the February 2003 external audit, the problems with the cross-training program, and the MEK incident. CCP replaced Williams with a Hispanic American Operations Manager. Bain received an oral warning

as a result of the MEK incident, and Ajumobi received a written warning. McIntyre was not disciplined as a result of the incident.

In January 2005, Williams filed suit in this Court, alleging that his termination was the result of racial discrimination, which is prohibited by 42 U.S.C. § 1981. Defendant now moves for summary judgment.

## II.　ANALYSIS

### A.　Legal Standards

#### 1.　Summary judgment standard.

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* FED. R. CIV. P. 56(c). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir.), *cert. denied*, 534 U.S. 892 (2001) (internal quotation marks and citation omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could enter a verdict for the non-moving party." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.*

#### 2.　Section 1981 standard.

Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981.

> In order to make out a *prima facie* case of discrimination [under § 1981,] a plaintiff alleging discriminatory discharge must show (1) that [he] is a member of a protected group; (2) that [he] was qualified for the job that [he] formerly held; (3) that [he] was discharged; and (4) that after [his] discharge, the position [he] held was filled by someone not within [his] protected class.

*Singh v. Shoney's, Inc.*, 64 F.3d 217, 219 (5th Cir. 1995).

Section 1981 claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

> *McDonnell Douglas* instructs that the plaintiff must first establish a *prima facie* case of discrimination. . . . Once the plaintiff presents a *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action. . . . If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination.

*Frank v. Xerox Co.*, 347 F.3d 130, 137 (5th Cir. 2003).  One way in which a plaintiff can establish pretext is by demonstrating that an employee outside of the plaintiff's protected class received better treatment under "nearly identical" circumstances.  *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (internal quotation marks and citation omitted).

The Fifth Circuit has adopted a modified *McDonnell Douglas* approach to cases in which plaintiffs allege that their terminations were *partially* motivated by racial animus ("mixed-motive" cases):

> After the plaintiff has met his four-element *prima facie* case and the defendant has responded with a legitimate nondiscriminatory reason for the adverse employment action[, t]he plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the

6

> defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).

*Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (internal quotation marks omitted; second alteration in original). If the plaintiff can meet the mixed-motives standard, "it then falls to the defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, [the] plaintiff prevails." *Id.*

### B. Plaintiff's Claim

The March 2003 written warning does not constitute an adverse employment action under the law of this circuit and cannot, therefore, serve as the basis for a *prima facie* case of discrimination under § 1981. *See, e.g.*, *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir. 1999) (stating that only "[u]ltimate employment decisions . . . such as "hiring, granting leave, discharging, promoting, and compensating" constitute adverse employment decisions). And while the allegedly insufficient increase in Williams's pay in December 2002 might otherwise give rise to a colorable claim of discrimination, such a claim is barred by the applicable statute of limitations:

> Federal civil rights actions brought under section 1981, which lack[s] an express statute of limitations, are governed by the most closely analogous limitations period provided under state law. . . . Under Texas law, one must file a discrimination claim under section 1981 within two years of the adverse employment action . . . .

*Pegram v. Honeywell*, 361 F.3d 272, 278-79 (5th Cir. 2004) (internal citations omitted); *see also Jones v. Alcoa, Inc.*, 339 F.3d 359, 364 (5th Cir. 2003) (holding that the most closely analogous state cause of action is a tort claim for personal injury); TEX. CIV. PRAC. & REM. CODE. § 16.003(a) (Vernon 1985) (establishing a two-year limitation

period for personal injury claims). Accordingly, the only claim that remains is Williams's termination claim.

Williams has established a *prima facie* case of discriminatory termination: it is undisputed that he is a member of a protected class, that he was qualified for the job that he held at the time of his termination, that he was terminated, and that he was replaced by a person who is not a member of his protected class.[1] CCP has articulated a legitimate, non-discriminatory reason for terminating Williams's employment; namely, that he repeatedly failed to fulfill his obligations to implement CCP's health and safety policies. The burden thus shifts back to Williams to present evidence demonstrating that CCP's articulated rationale is pretext or that his termination was at least partially motivated by racial animus.

Williams attempts to bear this burden by presenting evidence that a previous Operations Manager, who was Caucasian, was not terminated despite several injuries that occurred during his tenure in the position. Williams has not, however, presented any evidence demonstrating that that Operations Manager, Gary Mehring, had knowledge of or authorized the unsafe behavior that led to those injuries, as Williams did at the time of the MEK incident. Similarly, Williams has not shown that he and Mehring had similar disciplinary records, reflecting multiple violations and warnings.

Finally, Williams has not proven that the same decision-maker terminated both his employment and Mehring's, as the Fifth Circuit requires. *See Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 305 (5th Cir. 2000) ("Most importantly, the decision-makers

---

[1] While Defendant points out that Williams's replacement is a Hispanic American, the salient fact is not that the new Operations Manager is a member of a minority group but is, rather, that he is not a member of the *same* minority group to which Williams belongs. *See, e.g., Singh*, 64 F.3d at 219 (5th Cir. 1995).

8

who disciplined Waldrop differed from those who were charged with deciding what action to take against Burks. . . . The circumstances surrounding the disciplining of Burks and Waldrop thus fell short of 'nearly identical,' and reasonable jurors could not have justifiably believed otherwise."). Although Williams has alleged that Roussenac (who allegedly made the racist comment regarding Williams in late 2002) was a decision-maker in both instances, he has adduced no evidence to support that assertion, and CCP has introduced evidence refuting it. (*See* Def.'s Reply, Ex. 1 (Newman Aff.), at 1 ¶ 7 (stating, under oath, that Roussenac was not employed by CCP in 1997, when Mehring was demoted but not terminated as the result of an explosion at the Houston plant).) Accordingly, because Plaintiff has provided no evidentiary support for his allegation of disparate treatment, his § 1981 claim cannot survive beyond the summary judgment stage.

**CONCLUSION**

The Court reaches its conclusion with reluctance. Plaintiff is a very sympathetic figure and a credible witness. Under unambiguous precedents, however, this is, in itself, insufficient. For the reasons stated above, therefore, Defendant's motion for summary judgment is hereby **GRANTED**, and Plaintiff's claim is hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 29th day of March, 2006.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT.**